# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAMILLE BROWN, | CASE NO. 1:13-cv-01796-GBC |
| Plaintiff, | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 8, 9, 10, 23, 27, 28 |

## I.      Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of

Social Security ("Commissioner") denying Plaintiff Camille Brown's application for disability

insurance benefits. Prior to filing her brief in support of her appeal, Plaintiff filed a motion

entitled "Motion to Include Medical Records." (Doc. 10). This motion was effectively a motion

for a remand pursuant to sentence six of section 405(g), 42 U.S.C.  ("sentence six") to return the

case to the ALJ to consider new evidence. Sentence six requires that the records be new,

material, and omitted with good cause in order to justify remand.  The undersigned entered a

Report and Recommendation to deny this motion because the records either related to the period

of time after the ALJ's decision, and were therefore not material, or were cumulative to her prior

hospitalizations, and were therefore not new. (Doc. 25). The only new, non-cumulative

information contained in the records was Plaintiff's admission that, for three years during the

relevant period of time, she had been abusing prescription drugs and that this abuse likely caused

her hospitalizations.  However, this information was not omitted from the ALJ with good cause. Moreover, this information presented no reasonable likelihood that the ALJ would have decided differently. After the undersigned entered this Report and Recommendation, the parties consented to jurisdiction by the undersigned over resolution of this case. (Doc. 29). Consequently, the Order accompanying this Memorandum will deny Plaintiff's Motion to Include Medical Records in accordance with the Report and Recommendation issued June 12, 2014. (Doc. 25).

In her appeal, Plaintiff makes no more than bare, conclusory allegations that the "records and testimony" support her claims and impairments and that she met one or more of the Listings.[1] Plaintiff fails to develop her arguments beyond her one or two sentence allegations, and fails to address the detailed analysis by the ALJ discounting her testimony, summarizing the medical records and finding them contradictory to her claims, and making specific findings to support his conclusion that she did not meet a Listing. For all of the forgoing reasons, the Court will deny Plaintiff's appeal.

## II. Procedural Background

On November 12, 2010, Camille A. Brown ("Plaintiff") protectively filed[2] an application

---

[1] "A finding of disability on medical grounds alone is made when the individual's medical condition is one which meets the specific criteria in the Listing of Impairments (the listing) [20 C.F.R. Pt. 404, Subpt. P, App. 1] or is the equivalent of a listed impairment." Titles II & Xvi: Finding Disability on the Basis of Med. Considerations Alone-the Listing of Impairments & Med. Equivalency, SSR 83-19 (S.S.A 1983).

[2] Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

for disability insurance benefits ("DIB") under Title II of the Social Security Act. (Tr. 71, 99).[3]

On December 30, 2010, the Bureau of Disability Determination[4] denied this application, and Plaintiff filed a request for hearing on February 18, 2011.  (Tr. 77-78, 84, 86). On November 3, 2011, a hearing was held before an Administrative Law Judge ("ALJ") at which Plaintiff, who was represented by an attorney, and a vocational expert appeared and testified (Tr. 10, 42-70). On March 13, 2012, the ALJ found that Plaintiff was not disabled and thus was not entitled to benefits. (Tr. 7-20). On May 11, 2012, Plaintiff filed an appeal with the Appeals Council (Tr. 6), which denied Plaintiff's request for review on April 29, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-4).

On June 28, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g), to appeal the Commissioner's decision. (Doc. 1). On November 15, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 8, 9).

On January 31, 2014, Plaintiff filed a document entitled "Motion for Leave to File Mental Health Hospitalization Record" seeking to have her medical records from Lehigh Valley Hospital from January 29, 2013 and January 31, 2013 through February 7, 2013 ("Lehigh Valley Records") "included" in the record before the Court for the purposes of determining the merits of Plaintiff's appeal of the ALJ's decision. (Doc. 10). By Order dated April 24, 2014, the Court granted an extension of time to Plaintiff to file a brief in support of her appeal of the ALJ's denial of benefits until fourteen (14) days after a ruling was made on her motion for leave to file

---

[3] References to "Tr." are to pages of the administrative record filed by the Defendant as part of her Answer on November 15, 2013.

[4] The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 77-78.

mental health hospitalization record. On April 28, 2014, the Court referred this case to the undersigned Magistrate Judge. On June 12, 2014, the undersigned Magistrate Judge entered a report and recommendation to deny Plaintiff's motion because the only new, material evidence from the records was Plaintiff's admission that her hospitalizations had been largely caused by severe prescription medication abuse over the course of the prior three years and Plaintiff had no good cause for omitting her prescription abuse from the ALJ. (Doc. 25). Neither party objected.

Plaintiff filed a brief in support of her appeal on June 26, 2014. (Doc. 27). Defendant filed a brief in response on July 14, 2014. (Doc. 28). Both parties consented to the referral of this case to the undersigned Magistrate Judge on July 24, 2014, and an order referring the case to the undersigned Magistrate Judge was entered on August 4, 2014. (Doc. 29, 30).

### III.      Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere scintilla" of evidence, Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir 1999), and may be less than a preponderance. Jones, 364 F.3d at 503. If a "reasonable mind might accept the relevant evidence as adequate" to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence. Monsour Med. Ctr. v.

Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); Johnson, 529 F.3d at 200.

### IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. § 404.1520; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. See 20 C.F.R. § 404.1520.  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process,

the ALJ must also determine Plaintiff's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### V. Relevant Facts in the Record

A full description of the facts in this case can be found in the Report and Recommendation by the undersigned dated June 12, 2014 (Doc. 25). The Court will include only the facts relevant to Plaintiff's appeal here. To summarize, Plaintiff was born on December 18, 1972 and was classified by the regulations as a "younger individual" through the date of the ALJ decision. 20 C.F.R. § 404.1563. She has at least a high school education and past relevant work as a certified nursing assistant ("CNA") and a grinder. (Tr. 20).

### A.     Medical Records

#### a.     Migraines, Back Pain, Spine Issues

Plaintiff's primary care physician was Dr. Matthew Sophy, to whom she frequently reported migraine and neck pain. On January 9, 2009, Dr. Sophy ordered an MRI of Plaintiff's brain as a result of her intractable headache. The MRI revealed abnormalities likely related to migraine. (Tr.  212). Dr. Sophy referred Plaintiff to Dr. Mohammad Aslam for treatment of her migraine and back pain, and Dr. Aslam treated Plaintiff with facet nerve blocks and trigger point

injections. Injections on June 30, 2009 and August 4, 2009 made Plaintiff "quite relaxed." (Tr. 454, 456).  Injections on November 23, 2010, February 3, 2011, March 29, 2011, May 24, 2011 and August 11, 2011 were noted to make Plaintiff "practically pain free" or "relieved her pain completely." (Tr. 444, 446, 450, 452).  Dr. Aslam noted that she "should be able to carry on her activities of daily living without any problem." (Tr.  450, 452). Subsequently, Plaintiff reported to Dr. Aslam that she felt "wonderful" on September 1, 2011, that she still had headaches on September 23, 2011, that she felt "good" on October 26, 2011, and that she felt "terrible" on November 14, 2011. (Tr. 430-38).

An MRI of Plaintiff's spine on April 22, 2009 indicated "some" paravertebral muscle spasm, evidence of degenerative disc disease at all levels, posterior disc protrusion, bilateral nerve root canal stenosis, and herniation causing compression of the spinal column. (Tr. 211). An MRI from September 17, 2010 had the some indications and noted that the paravertebral muscle spasm and compression of the CSF and spinal column was now "significant"  and revealed posterior osteophyte formation causing indentation into the spinal column and CSF. (Tr. 180).  In contrast, Plaintiff had a cervical spine exam on April 24, 2011 that stated Plaintiff's paravertebral soft tissues appear normal. (Tr.   377). There was a relative straightening of the cervical spine that "perhaps" indicated "some degree" of paravertebral spasm, but the cervical vertebrae revealed normal stature, and there was no disc space narrowing, osteoarthritic changes, or large neural osteophytes. Id.

### b.    Abdominal Issues

Plaintiff was also treated between January 31, 2010 and December 8, 2010 for abdominal pain and an ulcer. (Tr. 185, 195-97, 208, 213-16, 250, 254, 267, 271, 285, 287, 289). At worst,

she experienced severe abdominal pain once a week. (Tr. 267). Plaintiff has not alleged any functional limitations from her abdominal issues.

### c.        Anxiety, Depression,  Mental State

Plaintiff reported shakiness, fatigue, pain, and moodiness to Dr. Sophy throughout the relevant time period. (Tr. 210, 226, 228, 265, 329, 348).  Dr. Sophy treated Plaintiff with various medications for her mental conditions. Id. Plaintiff was also treated for her mental conditions by providers at Access Outpatient Services from April through December of 2011. (Tr. 461, 467, 469, 471-74, 477-79, 487). She was diagnosed with bipolar disorder II, generalized anxiety disorder, and posttraumatic stress disorder (Tr.  461). Plaintiff was treated with Risperdal and assigned global assessment of functioning ("GAF")[5] scores of 45-50 on April 11, 2011 and May 17, 2011. (Tr. 469, 487). Plaintiff was noted to be calmer with Risperdal on April 26, 2011 and May 9, 2011 (Tr. 477, 479) and was seen and noted to be stable on June 2, 2011, September 5, 2011 and August 2, 2011, Plaintiff was seen and noted to be stable. (Tr.  474). On October 24, 2011, Plaintiff was seen for a thirty minute visit and reported that she had had a seizure. However, the treating provider, Dr. Bahman Sholevar, noted that she was a "very poor historian" and that they would need to get the medical records to determine what had happened. (Tr.  472). On November 22, 2011, Plaintiff arrived in the afternoon "all agitated" after missing an appointment in the morning and "full of complaints" about her family life, and was seen by Dr. Sholevar for a little more than an hour. (Tr.  471). There is no record of any subsequent treatment at Access Outpatient Services.

---

[5] "A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning." Schwartz v. Colvin, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders 3–32 (4th ed.1994).

### d.  Emergency Room Visits, Seizures, and Intoxication

Plaintiff's medical records indicate seven (7) emergency room visits to Schuylkill Medical Center in a seven (7) month period in 2011, largely relating to overmedication. On May 25, 2011, Plaintiff reported to the emergency room. (Tr.  374). Her chief complaint was that she was overmedicated. (Tr. 374). The treating physician noted that she had only "vague somatic symptoms" and discharged Plaintiff the same day. (Tr.  375).

On August 22, 2011, Plaintiff reported to the emergency room with slurred speech. Id. She had an unremarkable CT scan, was given Tylenol, and discharged. (Tr.  379).

On September 20, 2011, Plaintiff was admitted to the emergency room after her family reported that they had found her on the floor, nonresponsive. (Tr.  387, 395). While in the emergency room, Plaintiff had a witnessed episode of "questionable seizure like activity" where she lost consciousness, moved her extremities, and had rolling of the eyes. (Tr.  387).  Dr. Aslam concluded that she "most likely" suffers from a primary generalized epilepsy (Tr.   395), and discharged her the next day. (Tr.  387).

On October 7, 2011, Plaintiff was admitted to the emergency room because she felt dizzy and like she was going to have a seizure. (Tr.  410). She had taken four times her prescribed dose of Dilantin, assessed with Dilantin toxicity, and held for observation for 23 hours. (Tr.  411).

On November 9, 2011, Plaintiff was brought to the emergency room after a witnessed seizure episode. (Tr.  459). Plaintiff was observed by her mother to have bilateral arm movement and movement of her jaw. (Tr.   459). Plaintiff had another normal CT scan. (Tr.  458). Dr. Muhammed F. Salfullah, M.D., noted that she was likely noncompliant with her anticonvulsive medication because her Dilantin levels were very low. (Tr.  460). Plaintiff was discharged and

advised to follow-up with a neurologist or family doctor as soon as possible.

On November 30, 2011, Plaintiff was brought to the emergency room by ambulance. (Tr. 495). The Emergency Department Report notes that "[t]he ambulance reported that she had a seizure, but the patient's mother who called the ambulance said she did not have a seizure at all. The patient has simply been lethargic and weak and could even tie her shoes. This is a slow decline in function over the period of months without any acute symptomatology today." (Tr. 495). Plaintiff had a normal CT scan. (Tr. 491). Treating providers suspected that intoxication had caused Plaintiff's symptoms, explaining that "[a]t the time of re-examination the patient was much less somnolent and…her dysarthria was practically gone which would support diagnosis of intoxication with medication." (Tr. 497). Plaintiff was discharged the same day. Id.

On December 5, 2011, Plaintiff was brought to the emergency room by ambulance because she was "just not feeling well" and because she was confused after taking Xanax and diazepam. (Tr. 502). She was discharged home with a diagnosis of bipolar disorder. (Tr. 503).

### e.       Opinion Evidence

Dr. Aslam provided a telerecorded message to the Bureau of Disability Determination on January 28, 2011. (Tr. 295). Dr. Aslam indicated that Plaintiff could only lift and carry 2-3 pounds occasionally. (Tr. 301). He indicated that she was limited in her upper extremity pushing and pulling as a result of cervical pain. Id. He stated that she could "never" bend, kneel, stoop, crouch, balance or climb. (Tr. 302). He indicated no other limitations in physical function. Id.

### f.       ALJ Findings

The ALJ found that Plaintiff has not engaged in substantial gainful activity ("SGA")

since October 1, 2009. (Tr. 12, Finding 2).  Plaintiff is insured through December 1, 2014.[6]   The ALJ found that Plaintiff suffered from six (6) severe impairments during the relevant time period: seizure disorder, degenerative disc disease of the cervical spine, headaches, bipolar disorder, generalized anxiety disorder, and posttraumatic stress disorder. (Tr. 12, Finding 3). However, the ALJ found that these impairments were not completely disabling. Id.

   The ALJ found that Plaintiff's impairments do not meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). (Tr. 13, Finding 4). The ALJ determined that Plaintiff did not meet the "Paragraph B" criteria because she had only a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties with regard to concentration, persistence or pace, and has experienced no episodes of decompensation of extended duration. Id. at 13-14.  The ALJ determined that Plaintiff did not meet the "Paragraph "C" criteria because "the evidence of record" did not meet the requirements of Paragraph C. (Tr. 14, Finding 4).

   Accordingly, the ALJ performed a residual functional capacity ("RFC") analysis, and found that Plaintiff has the RFC to perform a range of sedentary work; can lift and carry 10 pounds occasionally, 2 to 3 pounds more frequently; occasionally push, pull or reach overhead with the upper extremities, stoop, crouch, and balance, climb stairs, ramps, ladders, scaffolds and ropes; rarely bend to the floor and occasionally bend to her knees; only emergently crawl and kneel; and is restricted from performing overhead activities, working at unprotected heights and working around dangerous moving machinery (and that she should avoid even moderate exposure in those circumstances).

---

[6] The ALJ incorrectly stated that Plaintiff is insured through October 1, 2015.

The vocational expert testified that Plaintiff was unable to perform her past relevant work as a CNA but could perform sedentary unskilled occupations such as a bench assembler (9070 positions in the Commonwealth of Pennsylvania, 450 positions in the region), a surveillance monitor (15,550 positions in the Commonwealth of Pennsylvania, 450 positions in the region) and a visual inspector (17,290 positions in the Commonwealth of Pennsylvania, 480 positions in the region). (Tr. 67). As a result, the ALJ concluded that Plaintiff was not disabled, and entered a decision denying Plaintiff benefits on March 13, 2012. (Tr. 20, Finding 6).

## VI.     Plaintiff allegations of error

### A.     The ALJ analysis at step three

Plaintiff alleges that:

> Plaintiff met over ten (10) listing criteria to be considered disabled. They include 11.02-grand mal seizure disorder; 12.04-Bipolar Affective Disorder Types I and II, 12.04-severe depression with diminished pleasure in activities, and overindulgence; 12.06-anxiety; 12.04(1)(f)-feelings of worthlessness and helplessness; 12.09-Past alcohol dependency; 1.04-Multilevel degenerative disc disease and disc bulges; 12.06-PTSD; 12.03-paranoid schizophrenia; 5.00(d)(4)(a)-Hepatitis C.

(Pl. Brief at 3). Plaintiff does not develop this argument any further, or provide any evidence that Plaintiff meets these listings.

The ALJ specifically addressed whether Plaintiff met the criteria for listing 12.04 and 12.06. He explained that, in order to meet the listings, one of the criteria is that "the mental impairments must result in at least two of the following: marked restriction in activities of daily living; marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation." (Tr. 13). The ALJ specifically found that Plaintiff did not meet these criteria because she had only mild restriction in activities of daily living, mild difficulties in social functioning, moderate difficulties in

concentration, persistence, or pace, and no episodes of decompensation. (Tr. 13-14). Plaintiff

does not challenge these findings. Thus, there is no merit with regard to her argument that she

meets a listing for 12.04-severe depression with diminished pleasure in activities, and

overindulgence, 12.04(1)(f)-feelings of worthlessness and helplessness, 12.06-PTSD, or 12.06-

anxiety. Plaintiff was never diagnosed with paranoid schizophrenia, so there is no merit to her

argument that she meets listing 12.03-paranoid schizophrenia.

Plaintiff was never definitively diagnosed with grand mal seizure. Instead, as the ALJ

noted, her doctor indicated that it was more likely a "partial seizure."  (Tr. 17). The ALJ also

explained that "the record contains predominantly self-reports about experiencing seizures and

objective diagnostic evidence has failed to corroborate, objectively, that she has a seizure

condition." (Tr. 17-18). The ALJ also explained that the two most recent hospitalizations

preceding his decision were suspected to be caused by prescription drug abuse, not seizures. (Tr.

18). The Plaintiff has not challenged any of these contentions by the ALJ. Thus, there is no merit

to Plaintiff's claim that she meets listing 11.02-grand mal seizure disorder.

Plaintiff's claims that she meets listings 1.04-Multilevel degenerative disc disease and

disc bulges and 5.00(d)(4)(a)-Hepatitis C are similarly without merit. Listing 1.04 requires, in

addition to a diagnosis of degenerative disc disease, that the diagnosis "result[s] in compromise

of a nerve root" and:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of
> pain, limitation of motion of the spine, motor loss (atrophy with associated muscle
> weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is
> involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> OR

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Although Plaintiff was diagnosed with multilevel degenerative disc disease and had disc bulges, she does not allege that she meets any of the other criteria for this listing. Moreover, the medical records from November of 2010 through the decision date consistently showed that Plaintiff's back pain was relieved "completely" with facet nerve block injections and did not limit her ability to engage in activities of daily living. Consequently, she did not meeting the requirements of Listing 1.04.

"Listing" 5.00(d)(4)(a) is not actually a listing. Instead, it is a definition of "chronic viral hepatitis," which is evaluated under Listing 5.05. The definition explains that chronic viral hepatitis can be "caused by" Hepatitis C. In other words, Hepatitis C can cause chronic viral hepatitis, but is not the same as chronic viral hepatitis. Plaintiff has not alleged that she meets any of the criteria for chronic viral hepatitis or that she meets any of the other criteria in Listing 5.05. Plaintiff's diagnosis, alone, is insufficient to show that she meets Listing 5.05.

Plaintiff failed to allege that her past alcohol dependency was a factor in her disability until her appeal to the District Court. Moreover, she does not allege any of the criteria for Listing 12.09. There is no evidence her past alcohol dependency causes any functional limitations.

Again, Plaintiff's arguments are bare and conclusory. Plaintiff did not sufficiently allege all of the criteria for any of the Listings she identified. As a result, the Court concludes that

substantial evidence supports the ALJ's determination at step three that Plaintiff does not meet any of the Listings.

## B.  The ALJ's RFC assessment

The Plaintiff argues that the medical records and testimony "support her claims and impairments" and that her treating physician opined that she could never bend, stoop, crouch, balance, and/or climb. (Pl. Brief at 3-4). However, Plaintiff does not develop this argument any further. She does not explain how her medical records and testimony support her claims and impairments, or describe the nature of the "claims and impairments" that these records support.

The Court finds that the ALJ properly evaluated the evidence in determining that Plaintiff's claimed limitations were overstated. Specifically, the ALJ rejected Dr. Aslam's limitations regarding bending, kneeling and stooping because they "ignore the fact that she's currently able to drive on a daily basis, shop for household goods, and attend medical appointments, which necessarily entails some stooping, bending, crouching, and climbing." (Tr. 19). The ALJ also explained that Dr. Aslam did not support his opinion with any clear objective findings and was inconsistent with the totality of the evidence. (Tr. 19). Plaintiff did not address or challenge any of these conclusions. Thus, Plaintiff has provided no reason for the Court to conclude that the ALJ lacked substantial evidence to assign little weight to Dr. Aslam's functional limitations. The Court also notes that, although Dr. Aslam's treatment notes from November 30, 2010 state that Plaintiff should "be able to carry on her activities of daily living" and his notes from February 3, 2011 state that she would be able to carry on her activities of daily living "without any problem," his opinion from January 28, 2011 states that she was severely limited in her ability to perform activities of daily living.

The ALJ also rejected Plaintiff's credibility. The ALJ determined that her neck and back injuries did not limit Plaintiff's ability to work on a continuous basis because her treating physician stated that trigger point and facet block injections would help her "carry on her activities of daily living without any problem" and that physical exams had been "essentially" normal. (Tr. 17, Finding 5). The ALJ determined that her seizures did not limit Plaintiff's ability to engage in work on a continuous basis because she was still able to drive and cook, no physician had restricted her driving, she had been noncompliant in taking Dilantin, and compliance with medication controlled the seizures. (Tr. 15-17 Finding 5).

The ALJ determined that her bipolar disorder, generalized anxiety, and post-traumatic stress disorder did not limit her ability to work on a continuous basis because she was prescribed only short-term therapy and medication monitoring, had been under no active treatment except for a short period in 2011, had experienced no psychotic breaks or decompensation episodes, frequently had a euthymic affect, and had been haphazard with regard to her mental health care. (Tr. 18-19, Finding 5).  Plaintiff has not challenged these findings.

The ALJ properly discounted Plaintiff's credibility and Dr. Aslam's report. Moreover, Plaintiff has not challenged these findings beyond claiming that "medical records and testimony" support Plaintiff's "claims and impairments." The ALJ discussed Plaintiff's medical records at length, explained how they failed to support or were inconsistent with her claims, discounted her credibility based on several specific, supportable reasons, and properly assigned little weight to her treating physician's report. Substantial evidence supports the ALJ's RFC assessment.

## C.  Remaining allegations of error

Plaintiff presents three other arguments. First, she argues that "the Vocational Expert testified at Plaintiff's hearing that there would be no employment available for Mrs. Brown based on all of the scenarios provided by the ALJ with all of Plaintiff's health restrictions." (Pl. Brief at 3). Plaintiff does not further develop this argument.  As discussed above, the ALJ properly discounted her testimony and her physician's opinion regarding her limitations.

Second, she argues that "Plaintiff is unable to perform [her] past relevant medium, semi-skilled heavy exertion work, and has no transferable job skills." (Pl. Brief at 3). This argument has no merit. The ALJ found that Plaintiff could not perform her past relevant work, and that transferability of job skills was not material to the determination because using the Medical Vocational Rules as a framework supports a finding that the claimant is "not disabled." (Tr. 20).

Third, she argues that the regional number of jobs available in the positions identified by the vocational expert is only 450, and that her impairments make her not very "employable." However, the only relevant inquiry is whether there are positions in the economy, not whether Plaintiff would actually be hired for them. The regulations specifically state that:

> It does not matter whether--
> (1) Work exists in the immediate area in which you live;
> (2) A specific job vacancy exists for you; or
> (3) You would be hired if you applied for work.

20 C.F.R. § 404.1566(a). The Third Circuit has held that less than 450 jobs in the regional economy is sufficient. Craigie v. Bowen, 835 F.2d 56, 58 (3d Cir. 1987)("[T]here were about 200 jobs in the light exertional category within his capabilities in his region. This is a clear indication that there exists in the national economy other substantial gainful work."). Thus, the Court finds no merit in this argument.

## VII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; <u>Brown</u>, 845 F.2d at 1213; <u>Johnson</u>, 529 F.3d at 200; <u>Pierce</u>, 487 U.S. at 552; <u>Hartranft</u>, 181 F.3d at 360; <u>Plummer</u>, 186 F.3d at 427; <u>Jones</u>, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. <u>Monsour Med. Ctr.</u>, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.

Dated: August 11, 2014

s/Gerald B. Cohn

GERALD B. COHN
UNITED STATES MAGISTRATE JUDGE